**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0037-19T2

C.M.S.,

    Plaintiff-Respondent,

v.

R.M.,

    Defendant-Appellant.

_____

Submitted October 1, 2020 – Decided January 7, 2021

Before Judges Ostrer and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Cumberland County, Docket No. FV-06-0072-20.

Jacobs & Barbone, PA, attorneys for appellant (Louis M. Barbone, on the brief).

Rutgers Domestic Violence Clinic, Rutgers Law, attorneys for respondent (Victoria Chase, Clinical Associate Professor, of counsel; Abigail Cook, admitted pursuant to <u>Rule</u> 1:21-3(b), on the brief).

PER CURIAM

Defendant appeals from a Final Restraining Order (FRO) issued under the New Jersey Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. The court granted the order after finding that defendant assaulted his then-girlfriend and that she needed protection. We affirm.

## I.

### A.

Both parties testified that they argued on the day of the assault, but their descriptions of the argument differed drastically. According to Carla,[1] her boyfriend Roberto, a police officer, had been drinking and was intoxicated. He wanted to go to a bar in Philadelphia, but could not remember the name. He repeatedly demanded that she tell him the name; when she refused, he tried to grab her phone from her hands, and accused her of hiding something from him.

Carla testified that she decided to leave, and that as she prepared to do so, Roberto attacked her, putting her in a "choke hold" and "flinging [her] around" in the bedroom doorway. Carla demonstrated or described the "choke hold" in various ways: either Roberto's hand or hands were on her shoulder, or his arm was around her neck. As she screamed for help, he tried to stick his fingers in

---

[1] We use pseudonyms for the reader's convenience, and to protect the privacy of the domestic-violence victim. See R. 1:38-3(d)(9) to (10).

her mouth. He blocked one door and locked another after she unlocked it. She said that during the altercation, Roberto punched her cellphone, making it "completely unusable." She also testified that he broke the house phone while she tried to use it to call 911. According to a police report, Carla did not say that Roberto broke the house phone, but only that the phone was unplugged. But Carla testified that she "believe[d]" she told the police that Roberto threw the phone at the wall.

Roberto stopped Carla from leaving not only by blocking the doors, but also by throwing her phone and keys near the knife block. She scrambled for the phone and keys, but feared that he might kill her with a knife. So she struck him several times with a frying pan before leaving the house.

After the fight, Carla drove straight to her sister's house, not to the police station, though both were the same distance away. She said that when she left the house she "had no phone or nothing that [she] could use." However, her sister testified that Carla called her from the car using Bluetooth.

Encouraged by her sister, Carla went to the police department and reported the incident. She told the interviewing officer that Roberto had been choking her. According to the police report, which Carla never signed, she claimed that

3

Roberto placed her in a "headlock," but she did not claim that she was "choked or lost consciousness."

Her sister took photos of her injuries after returning from the police station early the next morning. They depicted scrapes on Carla's hands, bruising on her arms and legs, and bruising near her shoulder and collarbone, but no bruising on her neck.

Roberto recalled the incident very differently. He testified that when Carla refused to answer his questions about the bar, he became "suspicious"; he "always ha[d] issues of trusting her." Nonetheless, when she left the bedroom, he simply moved out of her way, waiting until she reached the front door before asking if they could talk. Carla yelled at him, telling him to leave her alone and let her go.

She had to come back to get her keys; Roberto followed her, then tried to calm her down with a hug. His strategy backfired. Carla, yelling that she wanted to go and that she was leaving, struck him several times with a frying pan. Roberto told her to go. She left. When she was already in her car, Roberto called 911 to report that she assaulted him. Roberto offered into evidence photographs of his bruises.

A-0037-19T2

B.

Carla testified that the assault followed a history of controlling behavior and domestic violence. She said that Roberto tracked her physical movements using an app; he called her constantly; and he did not even let her close the door when she used the bathroom. When she tried to leave the relationship — which she did more than once — he looked for her, claiming that not only did he miss her, but that his children also missed her.

Carla recounted two specific incidents of violence. Unsurprisingly, her recollection of the events differs from Roberto's.

The first incident occurred more than a year before the predicate offense. According to Carla, she and Roberto quarreled while at a club. On the way home, Roberto, who was drunk, punched Carla and twisted her wrist. He also punched and damaged the car's dashboard. Carla's sister and brother-in-law testified that they each later confronted Roberto about his laying hands on Carla; Roberto apologized to the brother-in-law and promised both of them that it would never happen again.

Roberto gave a different account. He asserted that Carla struck him repeatedly, and he grabbed her wrist to protect himself. He admitted that he later apologized to her family members, but only "because she had bruising."

5

The second incident occurred not long after the first. According to Carla, she and Roberto got engaged. Around the same time, though, Roberto became violent and yanked her shoulder. When she told him she was leaving and not coming back, he broke her house key and her engagement ring.

But according to Roberto, Carla had repeatedly treated the ring with disdain, either throwing it at him or leaving it in the house. On the evening in question, she threw it. Frustrated, Roberto smashed the ring, but did not confront her physically.

C.

In its oral decision granting Carla relief, the court found Carla's testimony "entirely credible" and Roberto's testimony only partially credible. The court thus resolved any possible discrepancies in Carla's favor.

Regarding the parties' history, the court found that Roberto had attempted to control Carla by, for example, tracking her with an app. The court did not explicitly find that the wrist-twisting incident occurred the way Carla described it, but it concluded that Roberto must have done something wrong; otherwise, he would not have apologized to her family.

The court found that Roberto committed a predicate act of assault. It found that the photographs of Carla's injuries, including "a significant bruise

around her neck," supported her version of what happened that night, rather than Roberto's testimony that he merely tried to hug her. The court found that Roberto's calling 911 may have been a "preemptive strike" to protect himself from a possible restraining order.

The court also found that the parties had a history of domestic violence. Their relationship was "relatively toxic"; Roberto had an alcohol problem that damaged the relationship; and Carla tried to leave the relationship multiple times, but Roberto manipulated her into returning. The court determined that Carla would need protection in the future. Therefore, the court entered a final restraining order.

In his appeal, Roberto argues that the court's findings were not based on adequate, substantial, credible evidence. He principally argues that five aspects of the record undermine the trial court's findings. He contends that the court erred in believing Carla's testimony, because Carla delayed reporting the two earlier instances of domestic violence; after the final incident, she fled to her sister's home instead of to the police; her descriptions of the alleged chokehold varied; she falsely claimed that he broke her cell phone; and she inaccurately described their altercation concerning the landline phone.

7

## II.

In deciding whether to grant a final restraining order, a trial court must engage in a two-step inquiry. Silver v. Silver, 387 N.J. Super. 112, 125 (App. Div. 2006). The court must first determine whether the plaintiff proved, "by a preponderance of the credible evidence," that the defendant committed one of the predicate acts listed in the PDVA. Ibid. Assault is one of the predicate acts listed in the PDVA. N.J.S.A. 2C:25-19(a)(2). If the plaintiff and defendant share a history of domestic violence, the court must consider evidence of the predicate act in light of that history. Silver, 387 N.J. Super. at 125-26. If the court finds that the defendant committed a predicate act, the court must decide whether to issue a restraining order. Id. at 127. The court will issue a restraining order if a restraining order is necessary to protect a victim from further abuse. Ibid.

Roberto limits his argument to the trial court's fact-findings, under the first Silver prong, that he committed a predicate act and that there was a history of domestic violence. Findings by a trial court are generally binding on appeal, provided they are "supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). An appellate court should defer to the trial court's findings unless those findings appear "so manifestly

A-0037-19T2

unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Id. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). An appellate court owes a trial court's findings deference especially "when the evidence is largely testimonial and involves questions of credibility." Ibid. (quoting In re Return of Weapons to J.W.D., 148 N.J. 108, 117 (1997)). In addition, because of family courts' specialized expertise, an appellate court should accord special deference to a family court's findings. See id. at 413.

Under this deferential standard, we affirm. Roberto's arguments all attack the court's determinations of credibility — and a trial court (significantly, a family court dealing with a family matter) is particularly suited to decide issues of credibility. Here, the trial court's findings were not "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." In analyzing the court's findings and the alleged inconsistencies, we note that a trial court need not analyze in detail, on the record, all facts bearing on a witness's credibility. See State v. Locurto, 157 N.J. 463, 475 (1999).

Here, the trial court's findings, although limited, provide sufficient reason to affirm its judgment. The court relied heavily on the photographic evidence

of Carla's injuries. As the court noted, her bruising did not come from a mere hug. Given the sharp differences in the two parties' accounts, the photographs provided adequate, substantial, credible evidence supporting Carla's account and a finding that Roberto committed assault.

The court's finding that Roberto committed domestic violence in the past was also sufficiently grounded in credible evidence. Roberto had, after all, apologized to Carla's brother-in-law for her injury. The court reasonably rejected Roberto's explanation that he apologized simply because Carla was bruised, and not because he was at fault. Roberto admitted that he smashed Carla's ring, but excused his behavior by saying he was frustrated. The court also reasonably found that Roberto engaged in other controlling, if not always violent, behavior.

None of Roberto's claims of inconsistencies in Carla's testimony compel us to reject the trial court's findings. Roberto argues that Carla delayed reporting the first two instances of domestic violence to the police, and that she fled to her sister's home instead of the police station. But Carla testified she did not trust the police because Roberto, a police officer, had told her they would side with him. In addition, her sister's home was no farther away than was the police station.

A-0037-19T2

Roberto also argues that Carla described the alleged "chokehold" inconsistently. However, the trial court could reasonably attribute that inconsistency to a failure of memory due to trying circumstances. In any event, even if her descriptions varied, and even if he did not have her in a technical "chokehold," photographic evidence showed bruising in the shoulder and neck area — bruising consistent with a forceful grip, not a mere hug.

According to Roberto, Carla lied when she said that he had rendered her cellphone "completely unusable," because her sister testified that Carla called her from the car. But a phone may be unusable because of a cracked screen, yet retain some functionality when connected to another device, such as an automobile's touch screen. Indeed, in response to defense counsel's argument, Carla's counsel highlighted that explanation in summation, noting Carla's sister's testimony that Carla used Bluetooth to make her call. We may assume the trial court was persuaded by that explanation.

Finally, Roberto argues that Carla presented conflicting descriptions of the incidents regarding the house phone. But her descriptions did not necessarily conflict. Roberto, who had previously broken Carla's house key and engagement ring, could well have smashed the phone in anger, whether or not it was plugged in. Furthermore, perhaps Carla did tell the police that Roberto threw the phone,

11

but the police may have failed to include that information in the report — a report that Carla never signed.

In sum, the trial court's factual findings are adequately supported by substantial, credible evidence in the record.  Under those circumstances, "we may not second-guess its judgment." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 427 (2012).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0037-19T2